**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE DISTRICT OF PUERTO RICO**

IN RE:

VIRGILIO CORA SANTIAGO,

CASE NO. 12-06348 (EAG)

Debtor.

_____

MMM HEALTHCARE, INC. and PMC
MEDICARE CHOICE, INC.,

ADVERSARY NO. 13-00151 (EAG)

Plaintiffs/Counterclaim-defendants,

v.

VIRGILIO CORA SANTIAGO,

Defendant/Counterclaimant.

FILED & ENTERED ON 01/05/2017

_____

**OPINION AND ORDER**

Pending before the court are cross motions for summary judgment filed by plaintiffs/counterclaim-defendants MMM Healthcare, Inc. ("MMM") and PMC Medicare Choice, Inc. ("PMC") and defendant/counterclaimant Dr. Virgilio Cora Santiago ("Dr. Cora"), the debtor in the underlying bankruptcy case. For the reasons stated below, plaintiffs' motion for summary judgment at docket number 107 is granted in part and denied in part, and Dr. Cora's motion for summary judgment at docket number 104 is denied.

**I. JURISDICTION**

This court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a), Local Civil Rule 83K(a), and the General Order of Referral of Title 11

Proceedings to the United States Bankruptcy Court for the District of Puerto Rico, dated July 19, 1984 (Torruella, C.J.).[1] This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## II. PROCEDURAL HISTORY

On August 13, 2012, Dr. Cora filed a voluntary petition under chapter 13 of the Bankruptcy Code. (Bankr. Dkt. No. 1.) On January 30, 2013, sister companies MMM and PMC appeared in the case, filed an objection to confirmation of the chapter 13 plan, and requested that they be allowed to file a claim after the bar date. (Bankr. Dkt. Nos. 27, 28 & 31.) The following day, on January 31, 2013, the case was converted to chapter 7 on the debtor's request. (Bankr. Dkt. No. 34.) Subsequently, MMM and PMC filed a proof of claim, wholly secured in the amount of $213,298.00, corresponding to an audit of Dr. Cora's practice that found that he had been overpaid in that amount for services he provided from 2009 through 2011.[2] (Claims Register No. 4-1.)

On July 23, 2013, MMM and PMC filed an adversary complaint against Dr. Cora, seeking to have its claim deemed nondischargeable and objecting to discharge. (Adv. Dkt. No. 1.) On September 6, 2013, Dr. Cora filed an answer and counterclaim, bringing causes of action for breach of contract and violation of the automatic stay. (Adv. Dkt. No. 9.) MMM/PMC answered the counterclaim on October 14, 2013. (Adv. Dkt. No. 16.) After a referral to mediation did not prove fruitful (Adv. Dkt. Nos. 63, 67, 77 & 87), Dr. Cora filed a motion for summary judgment

---

[1] Unless otherwise indicated, the terms "Bankruptcy Code," "section" and "§" refer to Title 11of the United States Code, 11 U.S.C. §§101-1532, as amended. All references to "Bankruptcy Rule"are to the Federal Rules of Bankruptcy Procedure, and all references to "Rule"are to the Federal Rules of Civil Procedure. All references to "Local Bankruptcy Rule"are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Puerto Rico. And all references to "Local Civil Rule"are to the Local Rules of Civil Practice of the United States District Court for the District of Puerto Rico.

[2] It is not clear from the proof of claim on what basis MMM/PMC asserts that their claim is secured.

on October 14, 2015. (Adv. Dkt. No. 104.) MMM/PMC cross-moved for summary judgment the following day. (Adv. Dkt. Nos. 107, 108 & 109.) The parties filed their respective oppositions on December 4, 2015, and their replies on December 24, 2015. (Adv. Dkt. Nos. 123, 124, 125, 128 & 129.)

After several procedural delays, the matter was set for oral argument. (Adv. Dkt. No. 141.) At a hearing held June 23, 2016, arguments were heard and the parties were given an opportunity to supplement their motions to address several issues raised by the court. (Adv. Dkt. No. 144.) After the parties filed their supplemental briefs (Adv. Dkt. Nos. 152, 154 & 155), the matter was taken under advisement.

**III. UNCONTESTED FACTS**

The following facts are uncontested pursuant to Rule 56 and Local Civil Rule 56, made applicable to these proceedings through Bankruptcy Rule 7056 and Local Bankruptcy Rule 1001-1(b) and (d)[3]:

Plaintiffs MMM and PMC are health maintenance organizations, or HMOs, that contracted with MSO of Puerto Rico, Inc. so that their health plan members could access the MSO provider and Medicare Advantage networks. (Adv. Dkt. No. 108 at p. 2; Adv. Dkt. No. 123 at p. 2; Adv. Dkt. No. 108-1.) On October 1, 2011, Dr. Cora, a general practitioner who maintained offices in Aguada, Puerto Rico, during the relevant period, executed a provider services agreement with MSO. (Adv. Dkt. No. 108 at p. 2; Adv. Dkt. No. 123 at p. 2; Adv. Dkt.

---

[3]/Dr. Cora did not respond to proposed facts #34-#36 of plaintiffs' statement of uncontested facts (Adv. Dkt. No. 108 at pp. 12-13), nor to the statement of additional uncontested facts contained within plaintiffs' opposition to defendant's statement of uncontested facts. (Adv. Dkt. No. 125 at pp. 15-16.) Therefore, pursuant to the local anti-ferreting rules, those proposed facts are deemed admitted to the extent they are supported by record citation and do not constitute legal conclusions. L.Civ.R. 56(e).

No. 108-1.)  The agreement was for a one-year initial term that automatically renewed on an annual basis unless terminated under the procedures set forth in the agreement.  (Adv. Dkt. No. 108 at pp. 12-13; Adv. Dkt. No. 108-1 at p. 21.)

Under the agreement and in compliance with federal law regarding the Medicare Advantage program, Dr. Cora was required to maintain detailed records substantiating the services provided to plaintiffs' health plan members, and was subject to audit.  (Adv. Dkt. No. 108 at pp. 4-5; Adv. Dkt. No. 123 at p. 2; Adv. Dkt. No. 108-1 at pp. 14-16.)  If MSO determined that Dr. Cora had been compensated for services that were not covered due to insufficient or missing documentation, or that he had been compensated in error for services that were not rendered or were not reasonable, then it retained the right to recover any overpayment from Dr. Cora or to offset the amount due against future payments.  Id.  As part of the contract, Dr. Cora warranted that he was "in compliance with all applicable local, state and federal laws and regulations relating to the provision of medical services."  (Adv. Dkt. No. 108 at p. 2; Adv. Dkt. No. 123 at p. 2; Adv. Dkt. No. 108-1.)

On February 3, 2012, Dr. Cora was informed that a representative of MMM/PMC would be visiting his office on February 13, 2012, to review a sample of his patient medical records as part of a comprehensive claims review and audit process.  (Adv. Dkt. No. 108 at pp. 6-7; Adv. Dkt. No. 123 at p. 3; Adv. Dkt. No. 108-2 at p. 20.)  On the day of the audit, Dr. Cora's secretary, who handled the office billing and coded the medical records, certified on his behalf that the medical records his office provided to the auditors "were complete and contained all the information related to the patient medical services at [Dr. Cora's] office." (Adv. Dkt. No. 104 at p. 5; Adv. Dkt. No. 125 at pp. 6-7; Adv. Dkt. No. 104-12 at pp. 50-52; Adv. Dkt. No. 104-13 at

pp. 8-9; Adv. Dkt. No. 108 at p. 11; Adv. Dkt. No. 123 at p. 10; Adv. Dkt. No. 108-2 at pp. 35-36.) Dr. Cora's secretary also certified that he did not possess a drug storage license. (Adv. Dkt. No. 108 at p. 11; Dkt. No. 123 at p. 10; Adv. Dkt. No. 108-2 at pp. 35-36.) At some point after the initial visit, the auditors requested, and Dr. Cora provided, additional medical records for some beneficiaries. (Adv. Dkt. No. 125 at p. 15; Adv. Dkt. No. 104-12 at pp. 77-79.) In order to conducts its review, the auditors selected a sample of 65 beneficiaries (encompassing 4,559 services) for which MMM/PMC compensated Dr. Cora between 2009 to 2011, examining the progress notes in the medical files to determine if the services billed were reasonable and necessary, and that all other contractual requirements for MMM/PMC Medicare Advantage coverage and Medicare Advantage regulation had been met. (Adv. Dkt. No. 108 at p. 7; Adv. Dkt. No. 123 at pp. 3-4; Adv. Dkt. No.108-2 at pp. 21-24.) The sample results were then extrapolated to calculate the total amount of any over or underpayment. Id.

By letter dated April 25, 2012, MMM/PMC informed Dr. Cora of their determination that he had been overpaid in the total amount of $213,298.00 for services rendered from 2009 through 2011, broken down between the following billing codes: (1) $68,675.00 for inappropriate, unsupported, and/or undocumented use of modifier 25; (2) $13,465.00 for unsupported or undocumented services using codes HCPCS J1020, HCPCS J1040, CPT 20610, and HCPCS J7321; and (3) $136,396.00 for failure to comply with regulations regarding the use of the medication hyalgan.[4] Id. The audit found that 67% of the sampled services

---

[4] While the sum of these figures is actually $218,536.00, the audit results letter, in an apparent calculation error, refers to the total as $213,298.00. (Adv. Dkt. No. 108-2 at p. 21.) MMM/PMC's proof of claim also references the $213,298.00 figure. (Claims Register No. 4-1.) Accordingly, the court will adopt the latter figure throughout this opinion and order.

5

complied with the pertinent regulations.  Id.

Modifier 25 is "used to report a significant, separately identifiable evaluation and management service performed by the same physician on the day of a procedure … above and beyond the usual preoperative and postoperative care associated with the procedure or service that was performed." Id. HCPCS J1020 and HCPCS J1040 refer to different dosages of of methylprednisolone acetate injections.  Id.  CPT 20610 and HCPCS J7321, which together denote viscosupplementation therapy, are used where a patient's knee is injected with hyaluronan (or a derivative), hyalgan or supartz as a treatment of osteoarthritis.  Id.

With regard to the use of hyalgan (HCPCS J7321), the audit results letter stated that on March 15, 2012, MMM/PMC requested from Dr. Cora a copy of his drug storage license from the Puerto Rico Department of Health and documentation regarding his acquisition of hyalgan during the relevant period.  Id.; see Adv. Dkt. No. 138-3.  Per the letter, Puerto Rico law requires a drug storage license to store and administer medications to patients in an office setting.  Based on Dr. Cora's response that he had not obtained the drug storage license, and due to a failure to submit evidence documenting his acquisition of hyalgan (which Dr. Cora claimed was lost in an office burglary), the audit determined that Dr. Cora had been overpaid an estimated amount of $136,396.00 with regard to this billing code.  (Adv. Dkt. No.108-2 at pp. 21-24.)

The audit letter concluded by stating "If you believe that recoupment should not be put into effect, please submit a statement within 15 days of the date of this letter to the above address with a complete explanation of the reasons why you feel this action should not be taken.  You may also request a meeting with us during the 15 days [sic] period to answer any

concerns and submit additional evidence you may have." (Adv. Dkt. No. 104 at p. 5; Adv. Dkt. No. 125 at p. 8; Adv. Dkt. No. 108-2 at p. 24.)

Similarly, according to MMM/PMC's audit process manual, a provider may challenge the audit results in writing within 30 days from the date of receipt of the certified letter notifying the audit results, and may request a meeting to discuss the results of the audit. (Adv. Dkt. No. 104 at p. 6; Adv. Dkt. No. 125 at p. 8; Adv. Dkt. No. 104-17.) If a request for a meeting is made timely, such meeting will be set within 15 days, the purpose of which is to: 1) explain the overall auditing process, 2) inform the reason for the audit and the usage profile, 3) explain the findings that resulted from the audit, 4) advise the provider or supplier of determinations, and 5) offer payment options to settle the determined overpayment. Id.

Under the deadline set in either the audit results letter or the audit manual, Dr. Cora submitted timely a request to meet with MMM/PMC to discuss the results and an opportunity to provide additional documentation evidencing that the services in question were provided.[5] (Adv. Dkt. No. 104 at pp. 5-6; Adv. Dkt. No. 125 at p. 8; Adv. Dkt. No. 138-2.) Although it is not clear why, no meeting was held. (Adv. Dkt. No. 104 at p. 6; Adv. Dkt. No. 125 at p. 8; Adv. Dkt. No. 104-8 at pp. 22-28; Adv. Dkt. No 104-12 at p. 71; Adv. Dkt. No. 104-13 at pp. 83-84, 113.)

Following the audit, MMM/PMC referred the matter regarding Dr. Cora's

---

[5]/Dr. Cora argues that while the services in question may have been coded incorrectly, those errors do not evidence any fraud. (Adv. Dkt. No. 104 at p. 24.) In his letter to the MMM/PMC compliance department, Dr. Cora asserts that for the samples missing progress notes, they were simply misfiled under the wrong date by his secretary, who handled the billing and coding for the office. (Adv. Dkt. No. 138-2.) He also states that he has evidence in his possession demonstrating that he treated those patients. Id. He elsewhere admits, however, that he used modifier 25 to code at least some patients being treated only for osteoarthritis, not for any other separate identifiable service, as required by that billing code. (Adv. Dkt. No. 108 at pp. 11-12; Adv. Dkt. No. 123 at pp. 11-12; Adv. Dkt. No. 108-2 at pp. 38-48.)

documentation of hyalgan injections to Health Integrity, LLC, which investigates Medicare fraud, waste or abuse.  (Adv. Dkt. No. 104 at p. 7; Adv. Dkt. No. 125 at p. 10; Adv. Dkt. No. 104-22.) Health Integrity, LLC declined to pursue the matter further, however, stating, "[b]ased on the fact that, at this time, the complaint [about Dr. Cora] does not meet the prosecutorial guidelines or monetary thresholds established by the United States Attorney's Office and/or other law enforcement agencies, our file will be closed."  (Adv. Dkt. No. 104 at p. 7; Adv. Dkt. No. 125 at p. 10; Adv. Dkt. No. 124-1.)

On August 13, 2012, Dr. Cora filed a voluntary petition for relief under chapter 13 of the Bankruptcy Code.  (Adv. Dkt. No. 104 at p. 2; Adv. Dkt. No. 125 at p. 1; Bankr. Dkt. No. 1.)  On January 31, 2013, the case was converted to chapter 7 on the debtor's request.  (Adv. Dkt No. 104 at p. 1; Adv. Dkt. No. 125 at pp. 1-2; Bankr. Dkt. No. 34.)

Dr. Cora was informed by letter, dated March 1, 2013, that MSO was exercising its right to terminate his contract–"without cause"–effective May 1, 2013.  (Adv. Dkt. No. 108 at pp. 13; Adv. Dkt. No. 123 at pp. 12-14; Adv. Dkt. No. 108-2 at p. 49.)  The letter cites the provider services agreement, stating that the agreement "may be terminated without cause by either party at any time by written notice given at least sixty (60) days in advance of such termination."  Id.  The letter also provided that if Dr. Cora disagreed with the determination, he could appeal within 15 days to MSO's legal department, which would, in turn, have 15 days to perform its appeals review.  Id.  Plaintiffs did not move to lift the stay in the main bankruptcy case prior to either sending the letter or terminating the contract.  (Adv. Dkt. No. 104 at p. 9; Adv. Dkt. No. 125 at p. 13.)

In response, Dr. Cora's attorney sent a letter to MSO, dated March 8, 2013, asserting

8

that the unilateral termination of the contract was illegal, and informing MSO that Dr. Cora would be filing an adversary proceeding against MSO of Puerto Rico for violation of the automatic stay, among other things.[6] (Adv. Dkt. No. 104 at p. 9; Adv. Dkt. No. 125 at pp. 13-14; Adv. Dkt. No. 104-27.) The letter references his prior letter to MMM/PMC contesting the audit results. Id. Dr. Cora did not receive a response to this letter either. (Adv. Dkt. No. 104 at p. 9; Adv. Dkt. No. 125 at pp. 13-14.)

Dr. Cora continued to get paid for services until his contract was canceled, effective May 1, 2013. (Adv. Dkt. No. 104 at pp. 8-9; Adv. Dkt. No. 125 at p. 12; Adv. Dkt. No. 104-3; Adv. Dkt. No. 104-13 at p. 114.) Thereafter, Dr. Cora's income was significantly diminished, and he began to work in an emergency room in Bayamon to earn additional income to support his family. (Adv. Dkt. No. 104 at pp. 9-10; Adv. Dkt. No 125 at p. 14; Adv. Dkt. No. 104-12 at pp. 26-27; Adv. Dkt. No. 104-13 at p. 86.)

On July 23, 2013, MMM Healthcare and PMC filed an adversary proceeding objecting to the dischargeability of their claim against debtor under section 523(a) and seeking a denial of discharge under section 727(a)(4)(A). (Adv. Dkt. No. 104 at pp. 2-3; Adv. Dkt. No. 125 at p.2; Adv. Dkt. No. 1.) On September 6, 2013, Dr. Cora filed an answer and counterclaim, asserting causes of action for breach of contract and violation of the automatic stay. (Adv. Dkt. No. 104 at p. 3; Adv. Dkt. No. 125 at p. 3; Adv. Dkt. No. 9.) The plaintiffs answered the counterclaim on October 14, 2013. (Adv. Dkt. No. 104 at p. 3; Adv. Dkt. No. 125 at p. 3; Adv. Dkt. No. 16.)

---

[6]/While the letter is actually dated March 8, 2012, it is clear that this is a typographical error, since the letter concerns the contract termination, of which Dr. Cora had been informed on March 1, 2013, and because the mail return receipt indicates that the letter was delivered on March 12, 2013. (Adv. Dkt. No. 104-27.)

### IV. SUMMARY JUDGMENT STANDARD

The standard for summary judgment is well-known. Pursuant to Rule 56, made applicable to these proceedings by Bankruptcy Rule 7056, summary judgment is available "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010).  The moving party bears the burden of showing that "no genuine issue exists as to any material fact" and that he is "entitled to judgment as a matter of law." Vega-Rodríguez v. P.R. Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

Once a properly supported motion has been presented before the court, the opposing party "can shut down the machinery only by showing that a trial-worthy issue exists" that would warrant the court's denial of the motion for summary judgment. McCarthy v. Northwest Airlines, 56 F.3d 313, 315 (1st Cir. 1995).  For issues where the opposing party bears the ultimate burden of proof, that party cannot merely "rely on the absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." Id.  However, not every factual dispute is sufficient to frustrate summary judgment; the contested fact must be material and the dispute over it must be genuine.  Id.  An issue is "genuine" if it could be resolved in favor of either party.  A fact is "material" if it is potentially outcome-determinative.  See Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).

10

In assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990) (citations omitted). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted). However, there is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood (no matter how reasonable those ideas may be) . . . ." Greenburg v. P.R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987); see also Mulero-Rodríguez v. Ponte, Inc., 98 F.3d 670, 677 (1st Cir. 1996) (reversing summary judgment and emphasizing that "determinations of motive and intent . . . are questions better suited for the jury.") (quoting Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 34 (1st Cir. 1990)).

### V. APPLICABLE LAW AND DISCUSSION

**Complt. Count #1 - Nondischargeability under Section 523(a)(2)(A)**

MMM/PMC argue that Dr. Cora, either knowingly or in reckless disregard for the truth, submitted claims that were unsupported, overstated, or undocumented, and that he also falsely represented that he was in compliance with all applicable license and legal requirements under the provider service agreement. (Adv. Dkt. No. 109 at pp. 7-13; Adv. Dkt. No. 128 at p. 7-9.) The plaintiffs assert that they justifiably relied on these representations, and consequently paid Dr. Cora $213,298.00 more during 2009 through 2011 than he was actually entitled to under the Medicare regulatory scheme, as reflected in the April 2012 audit

11

results letter.  Id.

Specifically, the plaintiffs maintain that Dr. Cora intentionally "double billed" for patients receiving injections of hyalgan as a treatment for osteoarthritis by coding their visits under both HCPCS J7321 and CPT 99213 (modifier 25).  (Adv. Dkt. No. 109 at p. 9; Adv. Dkt. No. 128 at p. 7.) The former refers to the injection itself, and includes the typical pre- and post-operative care associated with the procedure.  (Adv. Dkt. No. 108-2 at p. 22.)  CPT 99213, used in conjunction with "modifier 25," is a code that applies only in the rare circumstances where a patient receives a "significant, separately identifiable evaluation and management service performed by the same physician on the day of a procedure."  (Adv. Dkt.  No. 108-2 at p. 21.) The auditors found that Dr. Cora used both codes but did not produce evidence that those patients receiving the injections were also treated for a "separately identifiable" condition. (Adv. Dkt. No. 108-2 at p. 23.)   Dr. Cora disputes those findings, and claims that any such billing errors, to the extent they were made, were simply mistakes.  (Adv. Dkt. No. 104 at pp. 23-24; Adv. Dkt. No. 138-2.)

At the outset, it should be noted that the audit results are silent as to whether the errors referenced therein were the result of fraud.  (Adv. Dkt. No. 108-2 at pp. 21-24.) And, while the matter was referred to Health Integrity, LLC, which investigates Medicare fraud, it found only that the matter did not "meet prosecutorial guidelines or monetary thresholds established by the United States Attorney's Office and/or other law enforcement agencies."  (Adv. Dkt. No. 124-1.)

While it appears that most, if not all, of the services in questions should not have been coded using "modifier 25," questions of fact remain, based on the summary judgment record,

as to whether Dr. Cora acted with the requisite scienter to find the debt nondischargeable. See JJ Best Banc & Co. v. Snyder (In re Snyder), 2014 Bankr. LEXIS 4605, at *9 (Bankr. N.D. W. Va. Oct. 31, 2014) (denying summary judgment in section 523(a)(2)(A) claim, court found that "although the record on summary judgment shows that the Debtors failed to honor their obligations under the security agreement, this is insufficient to show that the Debtor never intended to honor these obligations in the first place").

"[W]hen asked to infer scienter at the summary judgment stage of a proceeding, a court must proceed with care." Leominster Hous. Auth. v. Dunbar (In re Dunbar), 474 B.R. 14, 21 (Bankr. D. Mass. 2012). "Generally, summary judgment is inappropriate in cases where intent is an element of a claim, such as § 523(a)(2)(A)… [since] [i]ntent is a subjective state of mind and cannot be easily assessed from a record on summary judgment." Snyder, 2014 Bankr. LEXIS 4605, at *7 (internal citation omitted). Such is the case here, as the plaintiffs' contention would require the court to draw inferences against Dr. Cora, the non-movant, that "are not mandated by the record." Desmond v. Varrasso (In re Varrasso), 37 F.3d 760, 763 (1st Cir. 1994); see Schechter v. McAniff (In re McAniff), 2004 Bankr. LEXIS 670, at *16 (Bankr. N.D. Ill. May 21, 2004) (denying summary judgment on claim under section 727(d) where the "finder of fact could just as reasonably infer that the debtor acted, not with any fraudulent intent, but out of ignorance or ineptitude").

The plaintiffs argue, alternatively, that Dr. Cora's misuse of Modifier-25, together with his violation of the requirements regarding the acquisition, use and storage of the medication hyalgan, and the billing for various services that were not properly documented, collectively show a reckless disregard for maintaining accurate billing records that evinces an intent to

13

defraud. (Adv. Dkt. No. 109 at pp. 11-13; Adv. Dkt. No. 128 at pp. 7-9.) Regarding hyalgan, plaintiffs assert that, during the relevant period, Dr. Cora was required to have a drug storage license in order to keep and administer the medication in his office, and that he also needed to keep records of how he obtained the medication. Id.

It is uncontested that Dr. Cora did not have the license. Rather, he maintains that no such license was required under Puerto Rico law, and also points to the fact that this requirement was subsequently repealed, which is irrelevant. (Adv. Dkt. No. 104 at pp. 6-7.) He also claims that the records of his purchase of hyalgan were lost in a burglary. (Adv. Dkt. No. 123 at p. 10.) As to his use of Modifier-25 and the undocumented claims, Dr. Cora argues that any errors were simply mistakes, and that he attempted to meet with the auditors to dispute the results, as provided for the under the provider service agreement. (Adv. Dkt. No. 104 at pp. 23-24.) The plaintiffs, however, never met with Dr. Cora. (Adv. Dkt. No. 104 at p. 6; Adv. Dkt. No. 125 at p. 8; Adv. Dkt. No. 104-8 at pp. 22-28; Adv. Dkt. No 104-12 at p. 71; Adv. Dkt. No. 104-13 at pp. 83-84, 113.)

It is important to frame the issue correctly. The proper inquiry here is not whether Dr. Cora knew or should have known of the rules and regulations concerning the use of Modifier-25; the acquisition, use, and storage of hyalgan; and the importance of maintaining proper records of patient visits. A claim for nondischargeability is not based on the standard of care for negligence. Rather, "[t]he recklessness must exceed negligence and rise to the level of reckless disregard for the truth." In re Hathaway, 364 B.R. 220, 235 (Bnkr. E.D. Va. 2007) (internal citations omitted). The Palmacci Court describes the standard as follows:

> One who makes a statement as if it were one of positive fact ('as though he knew it') engages in a 'conscious deception' if he realizes he does not know the truth of his statement, even though he honestly believes its truth. In such a case, the person is deemed to have the intent to deceive (scienter), not so much as to the fact itself, but rather as to the extent of his information. . . . 'This is often expressed by saying that fraud is proved if it is shown that a false representation has been made . . . recklessly, careless of whether it is true or false.'

Palmacci, 121 F.3d at 787 (internal citations omitted). Triable issues of fact remain as to whether Dr. Cora acted with reckless disregard as to the truth of his representations to the plaintiffs. Again, at the summary judgment stage, where all inferences are drawn in favor of the non-movant, even assuming that Dr. Cora made false representations in his billing records, the plaintiffs have not established that these misrepresentations were due to the requisite level of carelessness. Therefore, summary judgment is denied.

**Complt. Count #2 - Objection to Discharge under Section 727(a)(4)(A)**

In their complaint, the plaintiffs also bring a cause of action for objection to discharge under section 727(a)(4)(A), alleging that Dr. Cora knowingly and fraudulently included inaccurate statements in his schedules and omitted important information from the statement of financial affairs (the "SOFA"). (Adv. Dkt. No. 1 at pp. 8-9.) Specifically, plaintiffs assert that Dr. Cora did not include the audit in the SOFA, despite the results being notified within one year of the filing of the bankruptcy case. Id. Plaintiffs also allege that Dr. Cora omitted from his SOFA that he received income from renting office space. Id. Further, the plaintiffs allege that the debtor omitted approximately $60,000.00 in office equipment and supplies from schedule B, but later testified at the meeting of creditors that he did own such equipment and supplies and submitted financial statements showing the same. Id.

Section 727(a)(4)(A) requires denial of discharge if "the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account." 11 U.S.C. § 727(a)(4)(A). Neither party addresses this cause of action in their summary judgment papers. In any event, issues of material fact remain as to whether Dr. Cora "knowingly and fraudulently" made a false oath as to his schedules and SOFA. In view of that, the court denies both the plaintiffs' and the debtor's motions for summary judgment on this claim. See Accardi v. Bartel (In re Bartel), 2008 Bankr. LEXIS 4337, at *8-*9 (Bankr. D. Mass. Dec. 23, 2008) (denying summary judgment where "a genuine issue of material fact [remains] as to the scienter and fraudulent intent requirements of § 727(a)(4)(A)").

**Counterclaim Count #1 - Breach of Contract**

In his counterclaim, Dr. Cora asserts a cause of action for breach of contract against the plaintiffs, arguing that the MMM/PMC did not allow him to dispute the audit results under the process outlined in the provider service agreement. (Adv. Dkt. No. 9 at pp. 18-19.) Specifically, Dr. Cora took issue with the auditor's finding that he needed a drug storage license to dispense hyalgan. Id. He also wished to correct some billing code errors. Id. Dr. Cora argues that the plaintiffs' failure to comply with the service agreement led to the cancellation of his contract with MSO, resulting in a sharp decline in the number of patients he could serve. Id.

Dr. Cora, however, does not have standing to bring this claim. Section 541(a) provides that the commencement of a bankruptcy case creates an estate consisting of "all legal or equitable interests of the debtor in property" as of that date. 11 U.S.C. § 541(a)(1). While not explicitly defined by the Code, courts have construed "legal or equitable interests" to include "legal claims, whether based on state or federal law." U.S. ex. rel. Spicer v. Westbrook, 751 F.3d

16

354, 361-362 (5th Cir. 2014) (citing In re Seven Seas Petroleum, Inc., 522 F.3d 575, 584 (5th

Cir. 2008)); see United States v. Whiting Pools, Inc., 462 U.S. 198, 205 n.9, 103 S. Ct. 2309, 76

L. Ed. 2d 515 (1983).  Whether a debtor has a legal claim or cause of action is a matter of state

law.  See Butner v. United States, 440 U.S. 48, 54-56 (1979) ("Congress has generally left the

determination of property rights in the assets of a bankrupt's estate to state law.").  Under

Puerto Rico law, a breach of contract claim accrues at the time of the breach.  P.R. Laws Ann.,

tit. 31 § 3018 ("Those who in fulfilling their obligations are guilty of fraud, negligence, or delay,

and those who in any manner whatsoever act in contravention of the stipulations of the same,

shall be subject to indemnify for the losses and damages caused thereby.").

Here, Dr. Cora's breach of contract counterclaim against the plaintiffs accrued on or

around April 25, 2012, when they sent the audit results letter, or shortly thereafter, when they

allegedly did not comply with the audit dispute mechanism.  (Adv. Dkt. No. 9 at pp. 18-19.)  Dr.

Cora filed the main bankruptcy case under chapter 13 of the Bankruptcy Code several months

later, on August 13, 2012.  (Bankr. Dkt. No. 1.)  Therefore, the pre-petition cause of action is

part of the debtor's bankruptcy case, although the court notes that the claim was not listed in

debtor's schedules.  (Bankr. Dkt. No. 14.)

The case was then converted to chapter 7 on the debtor's request on January 31, 2013.[7]

(Bankr. Dkt. No. 34.)  Upon conversion, the chapter 7 trustee became the sole representative

of the estate, granted the capacity to represent the estate and bring suit.  11 U.S.C. §§ 323 and

---

[7]/While court services subsequently entered a separate conversion order on February 20, 2013 (Bankr.
Dkt. No. 37), a debtor may convert a case from chapter 13 to chapter 7 at any time as a matter of right,
and the conversion is effective as of the filing of a notice of conversion, or, in this case, motion raised
in open court.  See 11 U.S.C. § 1307(a); Fed. R. Bankr. P. 1017(f)(3).

704(a). The debtor, in turn, now lacks standing to represent the estate other than in certain types of actions, such as violations of the automatic stay, which will be discussed below. See Wieburg v. GTE Southwest, Inc., 272 F.3d 302, 306 (5th Cir. 2001) ("Because the claims are the property of the bankruptcy estate, the Trustee is the real party in interest with exclusive standing to assert them.").

The trustee thus "steps into the shoes of the debtor for the purposes of asserting or maintaining the debtor's causes of action," provided that the claim remains in the bankruptcy estate. DiMaio Family Pizza & Luncheonette v. Charter Oak Fire Ins. Co., 448 F.3d 460, 463 (1st Cir. 2006) (quoting In re Rare Coin Galleries, Inc., 862 F.2d 896, 901 (1st Cir. 1988)). Here, the trustee did not file a notice of abandonment regarding the cause of action, nor was the claim deemed abandoned under section 554(c), since a "legal claim that is totally unscheduled may not be abandoned by operation of law under § 554(c)." Donarumo v. Furlong (In re Furlong), 660 F.3d 81, 87 (1st Cir. 2011).

Therefore, when the debtor filed his counterclaim on September 6, 2013, he lacked standing to do so. Accordingly, Dr. Cora's breach of contract counterclaim is dismissed for lack of standing. See O'Hare Midway Limousine Serv. v. Conroy (In re Conroy), 2006 Bankr. LEXIS 576, at *6 (Bankr. N.D. Ill. Apr. 17, 2006) ("Because the claim [for breach of contract] arose pre-petition, the claim is estate property, and only the trustee can prosecute it.")

**Counter-claim Count #2 - Violation of the Automatic Stay**

In his counterclaim, Dr. Cora also asserts a cause of action under section 362(k), arguing that the termination of the provider service agreement violated the automatic stay. (Adv. Dkt. No. 9 at pp. 19-20.) As an initial matter, unlike the breach of contract counterclaim,

18

a chapter 7 debtor does have standing to bring an action himself for willful violation of the automatic stay. Pertuso v. Ford Motor Credit Co., 233 F.3d 417, 422 (6th Cir. 2000).

Section 362(k) provides an individual with a means to redress violations of the stay, stating that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages." 11 U.S.C. § 362(k)(1). A willful violation does not require a specific intent to violate the automatic stay; rather, the debtor must show that the defendant intended the actions that constituted the violation and had knowledge of the stay. See Fleet Mortg. Group v. Kaneb, 196 F.3d 265, 269 (1st Cir. 1999). A debtor alleging a violation of the automatic stay must demonstrate, by a preponderance of the evidence, "(1) that a violation of the automatic stay occurred; (2) that the violation was willfully committed; and (3) that the debtor suffered damage as a result of the violation." Slabicki v. Gleason (In re Slabicki), 466 B.R. 572, 577-78 (B.A.P. 1st Cir. 2012). The burden is on the debtor to prove by a preponderance of the evidence that he or she suffered damages as a consequence of the violation of the automatic stay. See Heghmann v. Indorf (In re Heghmann), 316 B.R. 395, 404-05 (B.A.P. 1st Cir. 2004). Actual damages should only be awarded under section 362(k)(1) if there is concrete evidence supporting with reasonable certainty the amount of the award. Id. at 405.

MMM/PMC counter that they were simply acting within their rights under the contract, which bestows on either party the right to terminate the agreement without cause at any time with at least 60 days advance notice. (Adv. Dkt. No. 109 at pp. 4, 13-14; Adv. Dkt. No. 124 at pp. 7-8; Adv. Dkt. No. 128 at pp. 6, 9-10; Adv. Dkt. No. 108-1 at p. 21.). The plaintiffs stress that

19

they made no attempt to collect on the overpayment, pointing out, in fact, that by terminating the agreement, they gave up their right to recoup the debt from other amounts due to Dr. Cora, such as from services rendered in the future. Id. Plaintiffs also argue that the provider agreement is a personal services contract and, thus, does not qualify as property of the estate. Id. Alternatively, plaintiffs assert that even if the contract was terminated due to Dr. Cora's alleged Medicare fraud, that a termination on that basis qualifies as one of the exceptions to the automatic stay.[8] (Adv. Dkt. No. 152 at pp. 6-11; Adv. Dkt. No. 155 at pp. 3-6.)

The court will address the first two arguments together before reaching the third. While the plaintiffs may not have made overt attempts post-petition to collect on Dr. Cora's overpayment debt, which would fall under section 362(a)(6), they still could be in violation of the stay if they interfered with property of the estate. Section 362(a)(3) provides that the filing of the bankruptcy petition operates as a stay of "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The question then turns on whether the provider service agreement is an executory contract, and therefore property of the estate. See Alan N. Resnick & Henry J. Sommer, 3 Collier on Bankruptcy ¶ 362.03[5][a] (16th ed. 2014) (the debtor's executory contracts are considered property of the estate.) If so, then the termination of the agreement without first lifting the automatic stay would be a section 362 violation. Phillips v. Diecast Marketing Innovations, L.L.C (In re Collecting Concepts), 2000 Bankr. LEXIS 615, at *10 (Bankr.

---

[8]/While plaintiffs also appear to raise the issue of whether they received adequate notice of the bankruptcy filing prior to sending the termination letter on or around March 1, 2013(Adv. Dkt. No. 124 at p.7; Adv. Dkt. No. 128 at pp. 9-10), there is no question that they knew of the bankruptcy case at least as early as January 30, 2013, when plaintiffs appeared in the main bankruptcy case, filed an objection to confirmation, and requested permission to file a claim after the bar date. (Bankr. Dkt. Nos. 27, 28 & 31.)

E.D. Va. Feb. 28, 2000) ("As property of the estate, the debtor's interests in such [executory] contracts are protected against termination or other interference that would have the effect of removing or hindering the debtor's rights in violation of § 362(a)(3).") (citing 3 Collier on Bankruptcy, at ¶ 362.03 [5][a]).

In support of their position that the provider services agreement is a personal services contract, and thus not property of the estate, the plaintiffs cite primarily to McCready v. eBay, Inc., 2004 WL 626142 (N.D. Ill. Mar. 29, 2004) and Skiba v. Bimber (In re Bimber), 318 B.R. 297 (Bankr. W.D. Pa. 2004).  (Adv. Dkt. No. 109 at pp. 14-17; Adv. Dkt. No 128 at pp. 9-10.)  Both cases, however, are factually distinguishable and ultimately not persuasive.

McCready involved a chapter 7 debtor who had registered several accounts with the internet trading website eBay.  McCready, 2004 WL 626142, at *1.  Ebay claimed that the debtor violated the user agreement by "failing to deliver goods purchased by eBay buyers or by delivering product of less quality than what he had advertised on the web."  Id.  After receiving several fraud complaints, the site suspended the debtor's account.  Id.  The debtor moved for violation of the automatic stay, arguing that the suspension of his account and the directive from eBay to resolve his disputes with the purchasers were efforts to collect on pre-petition debts.  Id.  The bankruptcy court found that eBay had not violated the stay, and the debtor appealed to the district court.  Id.  The district court affirmed, finding that under the user agreement eBay had discretion to terminate a user's rights to use its site, and noting that eBay had not demanded that the debtor pay it or the claimants, or "state[d] or impl[ied] that [the debtor] had a legal obligation to do so."  Id. at *3.  Finding that eBay's action and communications did not rise to the level of coercion, the district court stated that "[a]n

21

individual who . . . buys and sells merchandise on eBay has no property right in that business arrangement." Id. at *4.

In Bimber, the debtor entered a contract, pre-petition, to serve as a surrogate mother in exchange for $15,000.00, plus expenses.  Bimber, 318 B.R. at 297.  The debtor did not include the contract in her schedules, and the trustee, after learning of it, sought to revoke the discharge.  Id.  The court, citing case law for the premise that "a personal services contract is not property of the estate," denied the trustee's request, finding no prejudice to the estate since the debtor was only in the early stages of pregnancy at the time of the filing, therefore most of the earnings, per the contract, would be post-petition and thus not property of the estate.  Bimber, 318 B.R. at 299-300.

The holdings in the two cases cited by the plaintiffs are very narrow, and are tied to the specific relationships at play in each.  As to McCready, the court does not find the relationship between a provider and a HMO to be analogous to that of an online merchant and seller.  While not expressly discussed, the McCready court does not appear to view the user agreement as an executory contract.  McCready, 2004 WL 626142, at *2-*3.  Typically, courts view an executory contract as "[a] contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other." Aguadilla Shopping Ctr., Inc. v. PMC Mktg. Corp. (In re PMC Mktg. Corp.), 447 B.R. 71, 78 (D.P.R. 2011) (quotation omitted); see 3 Collier On Bankruptcy, at ¶ 365.02[2][a].  In McCready, by contrast, the court notes that there was no ongoing obligation, stating:

> McCready was free to do nothing about the disputes, which may fairly be characterized as pre-petition debts, discharged in the bankruptcy. If he did nothing, eBay would take no action against him. eBay was free, however, to decline to do business with McCready while the matters remained unresolved.

McCready, 2004 WL 626142, at * 3.

Regarding Bimber, the unique nature of the surrogacy contract at issue demonstrates why Dr. Cora's personal service agreement does not qualify as a personal services contract. A personal services contract is one "which is personal in nature, where the personal needs, characteristics or personality of the obligee are dominant factors in the reason for contracting." In re C.W. Mining Co., 2009 Bankr. LEXIS 1527, *27 (Bankr. D. Utah Apr. 23, 2009) (citation omitted). Typical personal services contracts include "a contract to paint a portrait, write a novel, or perform other work requiring 'rare genius' and 'extraordinary skill.'" Mehul's Inv. Corp. v. ABC Advisors, Inc., 130 F. Supp. 2d 700, 705 (D. Md. 2001).

The provider service agreement at issue in this case does not meet that standard. The contract itself is boilerplate, covering a variety of types of doctors and specialties. (Adv. Dkt. No. 108-1.) As one court stated:

> While a contract for a physician's services might have been considered *ipso facto* a personal service contract 50 or 100 years ago, everything about these contracts and the nature of modern medical care militates against a finding that the contracts in question here are personal service contracts. Absolutely nothing . . . supports a finding that the contracts or the services to be rendered under them are *sui generis*. All of the physician contracts are essentially identical, and do not require the physicians to perform personally. They only require that the physician provide services to members, and require physicians to make "arrangements to assure care of his/ her Member patients after hours or when Physician is otherwise absent, consistent with Health Plan's administrative requirements."

In re Health Plan of the Redwoods, 286 B.R. 407, 409-410 (Bankr. N.D. Cal. 2002). See Cinicola v. Scharffenberger, 248 F.3d 110, 123 (3d Cir. Pa. 2001) (treating physicians' employment contracts as executory contracts).

Other courts are also in agreement that provider agreements such as the one in question in this case are executory contracts. In re Vitalsigns Homecare, Inc., 396 B.R. 232, 239 (Bankr. D. Mass. 2008) ("a majority of bankruptcy courts considering the Medicare-provider relationship conclude that the Medicare provider agreement, with its attendant benefits and burdens, is an executory contract."); Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.), 973 F.2d 1065, 1075n.13 (3d Cir. 1992) ("A Medicare provider agreement easily fits within [the] definition [of executory contract.]").

The court thus finds that the debtor's provider agreement is an executory contract, and therefore considered property of the estate. As such, the unilateral termination of an executory contract may constitute a violation of the automatic stay. See Cohen v. Ernst & Young, LLP (In re Friedman's, Inc.), 372 B.R. 530, 548 (Bankr. S.D. Ga. 2007) ("A non-debtor's post-petition unilateral termination of an executory contract may constitute a violation of the automatic stay.").

That is, unless the automatic stay does not apply to the action in question. Section 362(b) provides certain exceptions to the automatic stay. Among them is section 362(b)(28), which excepts from the automatic stay "the exclusion by the Secretary of Health and Human Services of the debtor from participation in the medicare program or any other Federal health care program . . . ." 11 U.S.C. § 362(b)(28). "Federal health care program" is defined under the Social Security Act to mean "any plan or program that provides health benefits, whether

24

directly, through insurance, or otherwise, which is funded directly, in whole or in part, by the

United States Government . . . (other than the health insurance program under chapter 89 of

title 5, United States Code [5 USCS §§ 8901 et seq.]); or (2) any State health care program. . .

." 42 U.S.C. §1320a-7b(f).

"Exclusion" is a specific remedy contemplated by the Act. 42 U.S.C. § 1320a-7. It refers

to the prohibition of certain individuals from participation in any federal health care program,

and can be either mandatory or permissive. Id. Mandatory exclusion is required for criminal

convictions on various grounds. Id. Among the permissive exclusion grounds potentially

applicable here are:

> (6) Claims for excessive charges or unnecessary services and failure of certain
> organizations to furnish medically necessary services
> Any individual or entity that the Secretary determines--
> (A) has submitted or caused to be submitted bills or requests for payment
> (where such bills or requests are based on charges or cost) under subchapter
> XVIII of this chapter or a State health care program containing charges (or, in
> applicable cases, requests for payment of costs) for items or services furnished
> substantially in excess of such individual's or entity's usual charges (or, in
> applicable cases, substantially in excess of such individual's or entity's costs) for
> such items or services, unless the Secretary finds there is good cause for such
> bills or requests containing such charges or costs;
> . . .
> (11) Failure to supply payment information
> Any individual or entity furnishing, ordering, referring for furnishing, or
> certifying the need for items or services for which payment may be made under
> subchapter XVIII of this chapter or a State health care program that fails to
> provide such information as the Secretary or the appropriate State agency finds
> necessary to determine whether such payments are or were due and the
> amounts thereof, or has refused to permit such examination of its records by or
> on behalf of the Secretary or that agency as may be necessary to verify such
> information.

42 U.S.C. §§ 1320a-7(b)(6), 1320a-7(b)(11).

As part of the compliance program for the Medicare Advantage program, the United States Department of Health and Human Services ("HHS"), through the Centers for Medicare & Medicaid Services ("CMS"), has authority to, among other things "audit, evaluate, and inspect any books, contracts, records, including medical records and documentation of the [Medicare Advantage] organization, its first tier, downstream, related entity(s), or its transferee that pertain to any aspect of services performed, reconciliation of benefit liabilities, and determination of amounts payable under the contract, or as the Secretary may deem necessary to enforce the contract." 42 C.F.R. § 422.504(e)(2). HHS gives this directive effect by requiring that Medicare Advantage organizations, such as MMM/PMC, maintain compliance programs to help detect fraud, waste, and abuse. Id.; (Adv. Dkt. No. 152 at p. 9.)  As a result of MMM/PMC's compliance program, Dr. Cora was found to have been overpaid in the amount of $213,298.00. (Adv. Dkt. No. 108-2 at pp. 21-24.)  It then follows that even if the termination of Dr. Cora's provider service agreement in 2013 was fallout from the 2012 audit, that this was an act of permissive exclusion, taken on behalf of HHS, to aid in its efforts to curb waste and abuse in the medicare program.  (Adv. Dkt. No. 152 at pp. 9-10.)

Case law regarding the application of section 362(b)(28) is scant, especially cases where the party citing the exception is not HHS.  However, even assuming that MMM/PMC could take action on behalf of HHS, the court would still not be able to apply the exclusion at the summary judgment level.

Drawing a causal nexus between the audit results in April 2012, which indicated that Dr. Cora had received a significant overpayment, and the cancellation of Dr. Cora's provider service agreement by a different entity, MSO, more than 10 months later, in March 2013,

26

would require the court to draw an inference in favor of MMM/PMC. Nothing in the March 2013 termination letter indicates that Dr. Cora's provider service agreement was cancelled due to the audit. (Adv. Dkt. No. 108-2 at p. 49.) In fact, it provides no reason at all, simply citing to the provision in the agreement stating that it may be "terminated without cause by either party at any time by written notice given at least 60 days in advance." Id. The court notes that the provider service agreement does include, on the other hand, several mechanisms for terminating the agreement "for cause," stating that it can be terminated (1) "immediately" by MSO, if it determines that the providers violated certain sections of the agreement, if the "continuation of the agreement will negatively affect Beneficiaries' care," or if a provider "fails to adhere to the terms and conditions of this Agreement;" or (2) on 30 days notice by either party, upon the failure of the other party to keep or fulfill any "covenants, undertakings, obligations or conditions set forth in this Agreement," provided that the default is not cured within a 30-day period. (Adv. Dkt. No. 108-1 at p. 21.) Neither of those mechanisms was employed here though. Therefore, in the context of summary judgment where courts cannot draw such an inference in favor of the non-movant, the court cannot find that Dr. Cora's contract was terminated due to the audit. See Griggs-Ryan, 904 F.2d at 115 (in assessing a motion for summary judgment, the court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor."). The court thus rejects PMC/PMC's argument on this basis.

**Necessary Party under Rule 19(a)**

Finally, while plaintiffs did not raise this argument in its papers, the court briefly addresses the issue of whether MSO is a necessary party to this litigation, and whether the failure to include the company as a counterclaim defendant is grounds for dismissal of this cause of action.  See Fed. R. Civ. P. 12(b)(7) (made applicable by Fed. R. Bankr. P. 7012(b)).

Under Rule 19(a), made applicable by Bankruptcy Rule 7019, a court must first determine whether a party not joined in a litigation is "necessary" for a just determination of the case.  This determination is a two-step process, first requiring the court to see whether the party is "required" to be joined.   A party is "required" under the rule if:

> (1) in the person's absence complete relief cannot be accorded among those already parties, or
>
> (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

If a party is found to be "required," and it is not feasible to join that party to the litigation, then a court must determine whether the case should be dismissed.  Fed. R. Civ. P. 19(b).  In making this determination, the court looks to the following factors:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (b) shaping the relief; or (C) other measures, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice could be lessened or avoided; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

<u>Id</u>.

Here, the court finds that MSO is a required party to the violation of stay cause of action. Dr. Cora's provider services agreement is with MSO, not MMM or PMC. (Adv. Dkt. No. 108-1.) Likewise, the letter terminating the agreement was sent by MSO and states that, in the event Dr. Cora wished to appeal, he could submit a request to MSO. (Adv. Dkt. No. 108-2 at p. 49.) And, while the exact nature of the relationship between MSO and MMM/PMC is not clear from the summary judgment record, the companies appear to be separate entities. Per the provider service agreement, MSO is a Puerto Rico corporation that "has as its primary objective the management and administration of provider networks whose participants agree to participate in and comply with the policies, procedures and reimbursement mechanisms established by MSO." (Adv. Dkt. No. 108-1 at p. 2.) According to the Health Plan Schedule to Medicare Advantage Addendum, MMM and its sister company PMC "have contracted MSO for the use of the MSO Provider network to provide certain professional health care services to Health Plan Members." (Adv. Dkt. No. 108-1 at p. 32.) As stated in the audit manual, MMM and PMC subcontract their provider network from a third party, MSO. (Adv. Dkt. No. 104-17 at p. 1.) The court also notes that dismissal for nonjoinder is a drastic remedy, and should only be employed sparingly. <u>Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Rite Aid of S.C Inc.</u>, 210 F.3d 246, 250 (4th Cir.2000) (citing <u>Teamsters Local Union No. 171 v. Keal Driveaway Co.</u>, 173 F.3d 915, 918 (4th Cir.1999)). In view of this, Dr. Cora, the counterclaimant, is ordered to show cause within 14 days as to why the violation of the automatic stay counterclaim should not be dismissed under Rule 19(b), made applicable to this case by Bankruptcy Rule 7019, for failure to join MSO as a necessary party.

29

## VI. CONCLUSION

In light of the foregoing, the court hereby GRANTS IN PART plaintiffs' motion for summary judgment at docket number 107, dismissing Dr. Cora's breach of contract counterclaim. Plaintiffs' motion is otherwise denied. Dr. Cora's motion for summary judgment at docket number 104 is DENIED. Furthermore, Dr. Cora, the counterclaimant, is ordered to show cause within 14 days as to why the counterclaim for violation of the automatic stay should not be dismissed under Rule 19(b), made applicable to this case by Bankruptcy Rule 7019, for failure to join MSO as a necessary party.

SO ORDERED.

In Ponce, Puerto Rico, this 5th day of January, 2017.

Edward A. Godoy
U.S. Bankruptcy Judge